IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Donald E. Lamon, | ) | Civil Action No.  8:13-2625-RMG-JDA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28, U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2] For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

## PROCEDURAL HISTORY

On August 14, 2009,[3] Plaintiff filed applications for SSI and for DIB alleging an onset of disability date of June 1, 2007, in both applications. [R. 164–78.] He alleged disability based on disorders of the back (discogenic and degenerative), electrocution injury, lung operation and fever, and fractured arm as a child. [R. 66–67.] Plaintiff's claims were denied initially and on reconsideration by the Social Security Administration ("the Administration"). [R. 71–72, 87–94.] Plaintiff requested a hearing before an administrative law judge ("ALJ"), and, on November 2, 2011, ALJ John Bauer conducted a de novo hearing on Plaintiff's claims. [R. 33–62.]

The ALJ issued a decision on December 21, 2011, finding Plaintiff not disabled under the Social Security Act ("the Act"). [R. 18–32.] At Step 1,[4] the ALJ found Plaintiff met the insured status requirements of the Act through December 31, 2012, and had not engaged in substantial gainful activity since June 1, 2007, the alleged onset date. [R. 20, Findings 1 & 2.] At Step 2, the ALJ found Plaintiff had the following severe impairments: back impairment and left lower extremity paresthesia status post electrocution injury. [R. 20, Finding 3.] The ALJ also determined Plaintiff had the following non-severe impairments: carpal tunnel syndrome bilaterally; chest pain, fracture of the left arm at age eight with closed reduction; tonsillectomy at age 9; left kidney surgery for re-attachment of the ureter at age 28; removal of residual catheter at age 29; and lung resection for Valley

---

[3] Plaintiff filed a prior application for DIB on January 8, 2008, alleging disability due to a fractured back and herniated discs. [*See* R. 63–64.] The claim was denied because the information in his file was insufficient to determine the severity of his problems. [*Id.* at 64.]

[4] The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

Fever at age 35. [R. 21.] Further, the ALJ found there was insufficient objective evidence to find that Plaintiff's alleged depression and anxiety were medically determinable impairments. [*Id.*] At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 21–22, Finding 4.] The ALJ specifically considered Listings 1.04 (Disorder of the Spine) and 1.02( major dysfunction of a joint). [*Id.*] The ALJ noted there was no medical listing for an electrocution injury, and there is no evidence Plaintiff meets or equals any medical listing from this reported injury. [R. 22.]

Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant can lift twenty pounds occasionally and ten pounds frequently; the claimant can occasionally stoop, kneel, crouch, and crawl; the claimant can never climb ladders, ropes, or scaffolds; and the claimant can frequently balance.

[R. 22, Finding 5.] Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past work as a ranch hand and mill foreman. [R. 25, Finding 6.] Considering the Plaintiff's age, education, work experience, and RFC, however, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform. [R. 25–26, Finding 10.] Accordingly, the ALJ concluded Plaintiff has not been under a disability, as defined by the Act, at any time from June 1, 2007, through the date of the decision. [R. 26, Finding 11.] The ALJ, thus, declined to award either DIB or SSI benefits. [R. 26.]

Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined review.  [R. 4–9.]  Plaintiff filed this action for judicial review on September 25, 2013.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and the ALJ erred by

1. Improperly weighing the opinion of Plaintiff's treating physician, Dr. Bryan L. Andresen ("Dr. Andresen"), by rejecting certain stated physical limitations and improperly giving more weight to the opinions of state agency physicians; and,

2. Failing to sufficiently explain his findings with respect to his decision to exclude certain physical limitations from the RFC (i.e., the need to change station and avoid prolonged standing or walking).

Plaintiff seeks to a reversal of the Commissioner's decision and a remand for an award of benefits or, in the alternative, additional administrative proceedings.

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence because the ALJ

1. Properly considered Dr. Andresen's opinion; and,

2. Properly assessed Plaintiff's RFC.

Accordingly, the Commissioner submits the ALJ's final decision warrants affirmance.

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to

4

support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,*

611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim.  *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).  Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82

6

(4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by*

*amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## **APPLICABLE LAW**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

---

[5]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

8

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.   *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined

10

impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.    *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[6]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[7] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could

---

[6]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[7]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

11

perform other work that exists in the national economy.  *See* 20 C.F.R. §§ 404.1520(f)–(g),
416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden,
the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines
(the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers
primarily from an exertional impairment, without significant nonexertional factors.[8]  20
C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31
(4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving
exertional limitations).  When a claimant suffers from both exertional and nonexertional
limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case,
the Commissioner must use a vocational expert to establish the claimant's ability to perform
other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because
we have found that the grids cannot be relied upon to show conclusively that claimant is
not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to
prove by expert vocational testimony that despite the combination of exertional and
nonexertional impairments, the claimant retains the ability to perform specific jobs which
exist in the national economy.").  The purpose of using a vocational expert is "to assist the
ALJ in determining whether there is work available in the national economy which this

---

[8]An exertional limitation is one that affects the claimant's ability to meet the strength
requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  A nonexertional limitation
is one that affects the ability to meet the demands of the job other than the strength
demands. *Id.*  Examples of nonexertional limitations include but are not limited to difficulty
functioning because of being nervous, anxious, or depressed; difficulty maintaining
attention or concentrating; difficulty understanding or remembering detailed instructions;
difficulty seeing or hearing. 20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

particular claimant can perform." *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ

13

must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. §§ 404.1527(d), 416.927(d).

However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. §§ 404.1517, 416.917.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds

15

that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable

16

> objective evidence, such as clinical or laboratory diagnostic
> techniques, the adjudicator must evaluate the disabling effects
> of a disability claimant's pain, even though its intensity or
> severity is shown only by subjective evidence. If an underlying
> impairment capable of causing pain is shown, subjective
> evidence of the pain, its intensity or degree can, by itself,
> support a finding of disability. Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered. Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485;

*see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of

pain).

## VI.     Credibility

The ALJ must make a credibility determination based upon all the evidence in the

record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ

must articulate specific and adequate reasons for doing so, or the record must be obvious

as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

Although credibility determinations are generally left to the ALJ's discretion, such

determinations should not be sustained if they are based on improper criteria. *Breeden*,

17

493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor. But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Treating Physician Opinion and the RFC Determination**

Plaintiff contends the ALJ failed to properly assess the opinion of treating physician, Dr. Andresen. [Doc. 19 at 23.] Plaintiff argues that the ALJ incorrectly applied SSR 96-2p to Dr. Andresen's opinion by indicating that the ALJ's decision was consistent with Dr. Andresen's opinion when, in fact, the ALJ actually rejected portions of Dr. Andresen's opinion without sufficient explanation. [*Id.* at 23–24.] Specifically, Dr. Andresen had determined that Plaintiff could perform light work with certain physical restrictions (would need to change positions and would not be able to stand or walk for prolonged periods of time), but the ALJ did not give reasons why he rejected those physical restrictions. [*Id.*] Further, Plaintiff takes issue with the fact that the ALJ gave more weight to the opinions of state agency physicians whose assessments were completed in December 2009, prior to the date Dr. Andresen's treatment began. [*Id.* at 26.] Plaintiff also contends the ALJ's RFC determination was not properly determined and warrants further administrative proceedings. [*Id.* at 29.] However, the Commissioner contends that, although the ALJ could have expressed himself more clearly, the ALJ's RFC determination was "consistent with the broad stokes of Dr. Andresen's opinion." [Doc. 21 at 18.] The Commissioner

argues that Dr. Andresen found Plaintiff capable of more strenuous exertion than light work involves. [*Id.* at 17.] The Court agrees with Plaintiff.

### *Summary of Relevant Medical History*

In December 2006, Plaintiff was treated at the emergency room ("ER") of the Merle West Medical Center after having been run over by an ATV that he was riding. [R. 274.] According to Plaintiff, his left foot got caught under the rear wheel on the left side and the bike ran up his leg as it pulled him off of the ATV and came to rest on top of his pelvis and abdominal area. [*Id.*] On examination, Dr. Alden Glidden ("Dr. Glidden") determined there was no evidence of fracture or dislocation in the pelvis or proximal femurs. [R. 279.] Plaintiff was diagnosed with a "stretch injury to his left leg, probably a stretch to his psychiatric nerve." [R. 274.]

On June 1, 2007, Plaintiff underwent an Independent Medical Evaluation by Dr. Lynne Bell ("Dr. Bell"), Neurologist at Star Medical, after an electrocution accident at work. [*See* R. 283–92.] Plaintiff's medical history information included borderline diabetes, left nephrectomy (two-thirds of lung removed due to Valley fever), and alcohol nightly (2 drinks). [R. 285.] Plaintiff reported he was working on an irrigation pump when he noticed a box that was smoking. [R. 283.] When Plaintiff tried to open the box, he touched the contacts where there had been a short in the ground, and the next thing he remembered was waking up a few feet away. [*Id.*] It was determined that Plaintiff was shocked by 440 volts running an irrigation pump. [R. 284.] Plaintiff was aware that his entire left side was numb, including his left flank, left arm, and left leg. [*Id.*] While the numbness in his left arm improved, Plaintiff continued to have symptoms in his left leg, including pain, hypersensitivity, and weakness. [*Id.*] Dr. Bell's report notes that on June 4, 2007, Plaintiff

19

saw Dr. Arsheeya Mashaw ("Dr. Mashaw") at Cascades East Family Practice Center reporting some left-sided numbness and burning affecting the left foot which worsened after standing more than 10 minutes. [*Id.*]   The report also notes that on August 1, 2007, Dr. Kevin J. Sullivan ("Dr. Sullivan") of Medford Neurological and Spine Clinic attempted to do nerve conduction studies of the left peroneal nerve, but Plaintiff could not tolerate touching his foot or attempted stimulation of the peroneal nerve. [R. 286.] Dr. Sullivan noted Plaintiff's symptoms were most consistent with a complex regional pain syndrome ("CRPS") and recommended a lumbar sympathetic block be done as well as high-dose steroids. [*Id.*] Dr. Sullivan also noted that strength seems symmetric but it was hard for Plaintiff to hold his foot against resistance due to marked allodynia.[9] [*Id.*]

On physical exam, Dr. Bell's notes indicate that Plaintiff's left leg appeared smaller than the right, and there was a slight difference in temperature between the left and right tarsal regions. [R. 287.] Dr. Bell found Tenel signs unreliable, straight leg raises negative bilaterally, and full range of motion in the knees and ankles. [*Id.*] During the neurological exam, Dr. Bell found normal findings with respect to the cranial nerves, 5/5 strength in the upper extremities, reduced grip strength in the left hand, and reflexes symmetrical at the biceps, triceps, and brachioradialis. [R. 288.] Dr. Bell noted that lower extremity strength was difficult to assess on the left side in that Plaintiff was able to give 5/5 strength testing the quadriceps and hamstrings in the left leg, but all other movements from the knee down were characterized by giveway and resistence to the examiner even touching the foot in

---

[9]Allodynia is defined as "a mild stimulus that is not ordinarily painful causes pain."  It is a type of pain that seems to be caused by the presence of prolonged chronic pain.  Dan J. Tennenhouse, ATTORNEYS MEDICAL DESKBOOK § 26:9 (4th ed. Supp. 2014).

order to do resistive muscle testing. [*Id.*] The most Plaintiff could exhibit was 2/5 to 3/5 movements, dorsiflexion, plantar flexion, inversion and eversion in the left lower extremity. [*Id.*] Dr. Bell noted that sensory testing revealed an unusual clinical profile in that, whether she touched his lower extremities with a pin or with her finger, it caused shooting electrical sensations down the leg. [*Id.*] Dr. Bell also noted Plaintiff's gait was antalgic, favoring the left leg; and that he also walked in an antalgic manner when walking heel/toe although he could get up several inches of his left foot before collapsing. [*Id.*] Dr. Bell recommended additional objective testing by a neuromuscular specialist to determine appropriate work restrictions and before declaring him medically stationary. [R. 291.]

Plaintiff was seen by Dr. Katy Wessel, D.O. ("Dr. Wessel") at Cascades East on June 7, 2007, and, at the time, Plaintiff was tender to the left flank to palpation and had some tingling in his left leg, but his motor strength appeared intact in the lower extremities bilaterally. [R. 300.] On June 19, 2007, Dr. Wessel at Cascades East limited Plaintiff to very light duty, walking less than five minutes and indicated he could work sitting on a tractor. [R. 333.] On July 6, 2007, Dr. Wessel evaluated Plaintiff, and he appeared slightly hyper-reflexic in the left patella DTR compared to the right. [R. 301.] His gait was assessed as poor with some difficulty lifting his left leg. [*Id.*] Dr. Wessel had Plaintiff fitted for an AFO brace to prevent him from a complete foot drop and referred him to Dr. Michael Narus for a neurological consult. [*Id.*] On July 11, 2007, Dr. Wessel excused Plaintiff from work indicating he was having increased pain and had loss of motor control of his left foot. [R. 327.] On August 14, 2007, Dr. Wessel excused Plaintiff from work indicating he was still having left foot drop and nerve pain. [R. 325.]

On October 10, 2007, Plaintiff was referred to Klamath Pain Clinic for consultation by Dr. Wessel due to his lower left extremity nerve pain with slight foot drop status post electric shock. [*See* R. 300–06.]  Plaintiff was seen by Barbara Gilbertson, D.O. ("Dr. Gilbertson"), at the Klamath Pain Clinic.  [R. 306.]  Dr. Gilbertson noted Plaintiff was color blind, wore glasses, and was unable to sleep secondary to pain. [R. 303.] Dr. Gilbertson noted Plaintiff's upper extremities had an unremarkable appearance and his lower extremities had normal color and temperature and texture bilaterally in the feet, but that Plaintiff had marked allodynia to palpation of the left foot.  [R. 304.]  Dr. Gilbertson noted that wearing the AFO, Plaintiff had a bit of a limp but walked better than expected without the AFO.  With respect to his extremities, Plaintiff measured slightly smaller in the left thigh and calf as compared to the right.  [*Id.*] Plaintiff also scored a 0.36 out of 1.0 for physical function. [R. 305.]

Dr. Gilbertson diagnosed Plaintiff with "(1) neurogenic pain consistent with chronic regional pain syndrome following an electrocution injury; and (2) foot drop that could certainly be part of a CRPS syndrome, but could also be related to nerve root disturbance and/or peroneal nerve injury. The history of patient being thrown four to six feet and hitting his back against a concrete slab and then the findings of spasm at the left of L5 on exam with local tenderness could possibly suggest nerve root injury that could have occurred at the same time involving the L5 nerve." [R. 305.]   Dr. Gilbertson recommended a sympathetic nerve block ASAP followed by electro-diagnostic studies and lumbar MRI to rule out a concomitant nerve root problem.  [R. 306.]  Dr. Gilbertson also indicated that Plaintiff should move toward a spinal cord stimulator and, with the stimulator, he could resume work.  [*Id.*]

On December 17, 2007, Dr. Karl Wenner ("Dr. Wenner") of Sky Lakes Outpatient Rehabilitation performed Plaintiff's surgery to repair a herniated nucleus pulposus, L5-S1 on the left. [R. 321.] In April 2008, Plaintiff underwent an outpatient rehabilitation evaluation by Dr. Wenner. [*See* R. 307–08.] He noted the following. Plaintiff had undergone disc surgery 3 months prior to the evaluation and was walking up to a mile a day and his standing and sitting were better. [R. 307.] Sitting for long periods of time, however, resulted in "coldness" in his foot and "numbness". [*Id.*] Plaintiff also experienced swelling just below the malleolous and close to the area of exit in the heel from the electrocution by the end of the day. [*Id.*] And, if his left leg is touched, he experienced pain down into the forefoot and is very sensitive in that area. [*Id.*] In his home environment, Plaintiff can get things done but has to do them slowly and carefully. [*Id.*] Plaintiff has difficulty picking up things below his waist, and the weight of a plate of food is the most he is comfortable carrying. [*Id.*]

In July 2008, a Work Capacity Evaluation was conducted for Plaintiff by Christopher A. Park, OTR, FABDA ("Mr. Park"), occupational therapist. [*See* 371–85.] Muscle testing resulted in measurements which were not considered valid due to "lack of palpable muscle contraction, cogwheeling and sudden give-way release with light two finger pressure." [R. 374.] Mr. Park noted that musculoskeletal evaluation revealed mild muscle tightness at lumbar paraspinals without palpable muscle spasm, cramp, or trigger points. [*Id.*] Plaintiff's lumbar spine range of motion was noted to be moderately to severely limited due to pain. [*Id.*] Sensation to the left foot revealed a dramatic and hyper reactive withdrawal and report of immediate "electrical shocking pain" ascending from the left great toe through the left lower extremity to the left buttock with any touch at the left foot or anywhere at the lower

left extremity. [*Id.*] When showing Mr. Park where the exit wound was on his left medial heel, Plaintiff touched the area four different times without any dramatic withdrawal or report of ascending pain. [*Id.*]

With respect to functional strength, Mr. Park found Plaintiff could lift 5 pounds occasionally; could carry 5–15 pounds occasionally; could lift/laterally transfer 5–12.5 pounds waist-to-waist occasionally; and could lift 5–10 pounds waist to shoulder occasionally. [R. 375.] With respect to dexterity and coordination, although he scored below average on the testing for coordination and dexterity, Plaintiff demonstrated few drops or fumbles while repetitively reaching and manipulating circular wooden disks. [R. 376.] With respect to endurance, Plaintiff was observed to sit for a maximum of 60 minutes consecutively and a total of two hours during the evaluation. [R. 376.] Plaintiff was observed to stand and move for 15 minutes consecutively and a total of two hours during the evaluation. [*Id.*] Plaintiff was noted to be able to stand on an occasional basis. [*Id.*] Plaintiff was also observed to ambulate in and around the clinic at a slow to moderate pace using an assistive device and with a variable left lower extremity limp and antalgic gait. [*Id.*] Mr. Park described Plaintiff's walking capacity as equal to 30–45 minutes at a time consecutively over level terrain and on an occasional basis. [R. 377.] Plaintiff was unable to balance on his left lower extremity at any time; was able to walk over bilateral heels for 15 feet; but was unable to complete toe walking due to left foot and low back pain. [*Id.*] With respect to repetitive movements, Mr. Park noted Plaintiff was able to bend at the waist and squat on an occasional basis; was able to reach forward on a frequent to constant basis; and was able to reach overhead with the right and left upper extremities on a frequent basis. [R. 377–78.]

24

A "spinal function sort" assessment performed by Mr. Park placed Plaintiff in the light-medium physical demand performance level; however, he demonstrated "mild difficulty" lifting 20 pounds from floor to waist and demonstrated a maximum floor to waist lift of 5 pounds.  [R. 378.]  Responses to the Oswestry Low Back Pain Questionaire indicated the impact of Plaintiff's low back pain on a variety of activities in daily living scored in the range of "Moderate Disability."  [R. 379.]  Mr. Park observed that Plaintiff put forth less than full effort in testing and appeared to be self-limiting in materials handling.  [*Id.*] Mr. Park also noticed inconsistencies in Plaintiff's presentation and performance leading him to find the evaluation to not be a valid and reliable indicator of Plaintiff's physical and functional capacities.  [*Id.*] Mr. Park concluded that, while Plaintiff's performance during the evaluation put him at the sedentary physical demand performance level, he was likely capable of functioning at the light-medium physical demand performance level had he put forth his best efforts.  [*Id.*]  On August 2, 2008, Dr. Wenner indicated he agreed with Mr. Park's projected RFC of light-medium work for Plaintiff.  [R. 404.]

A Physical RFC Assessment conducted by Dr. Sharon Eder ("Dr. Eder") on December 9, 2009, found Plaintiff capable of lifting 20 pounds occasionally, 10 pounds frequently, standing/walking/sitting 6 hours in an 8-hour day, with limited pushing/pulling in the lower extremities.  [R. 458.]  Dr. Eder also found Plaintiff capable of frequent balancing; occasional climbing ramp/stairs, stooping, kneeling, crouching, and crawling; but never climbing ladders/ropes/scaffolds. [R. 459.]

On January 11, 2010, Plaintiff was referred to Dr. Bryan Andresen ("Dr. Andresen") for evaluation and treatment.  [*See* R. 473–75.]  Exam notes indicated Plaintiff walked with a limp favoring his left side; had moderate tenderness to palpation over the left greater than

25

right mid to superior gluteal area; had decreased sensation in the foot to pinprick, foot dorsum, and plantar surface; and that there is allodynia and hyperpathia over the almost entire left leg. [R. 474.] The exam notes also indicated that sensation was intact in both upper extremities and the right leg, and that motor strength was 5/5 in the right lower extremity and generally 4/5 in the left lower extremity, although difficult to assess due to pain. [R. 474–75.] After an examination on March 2, 2010, Dr. Andresen confirmed Plaintiff was essentially at a sedentary/light duty capacity. [R. 520.]

On March 10, 2010, Plaintiff underwent a bone scan by Dr. John Dohrman ("Dr. Dohrman") at the request of Dr. Andresen. [R. 491.] The bone scan findings showed normal blood flow in both lower extremities and mild degenerative changes in the lumbosacral spine and pelvis. [*Id.*] On April 23, 2010, after receiving the bone scan results, Dr. Andresen again found Plaintiff could continue with sedentary/light duty work and encouraged him to continue his vocational search. [R. 521.]

Plaintiff also saw Dr. Andresen on April 4, 2011, on follow up regarding his low back and leg pain, medication adjustments, and return to work plans. [R. 533.] Dr. Andresen noted that Plaintiff was working with small engine repair/forman at a light duty capacity with no lifting greater than 25 pounds. [*Id.*] On June 17, 2011, Plaintiff underwent a right ulnar motor and sensory nerve conduction study by Dr. Andresen at the request of Dr. Christine Jensen-Fox ("Dr. Jensen-Fox"). [R. 534.] Results of the testing indicated moderate severity bilaterally in the wrists and chronic denervation changes in the median thenar innervated musculature. [*Id.*] On June 28, 2011, Plaintiff was seen by Dr. Jensen-Fox with complaints of numbness in his hands and a great deal of discomfort greater in the right

than left.  [R. 496.]  Plaintiff had a prior EMG study or carpal tunnel with Dr. Andresen, but the study was not available for Dr. Jensen-Fox at the time. [*Id.*]

On October 28, 2011, Dr. Andresen provided the following information regarding his treatment of Plaintiff in response to questions from Plaintiff's counsel:

* He has treated Plaintiff since his initial consultation on January 11, 2010;

* Plaintiff's diagnosis included left-sided L5-S1 hemilaminectomy and microdiscectomy, and electrocution injury with persistent left leg pain and paresthesias, and carpal tunnel syndrome;

* Plaintiff's medical conditions are verifiable, particularly postsurgical changes in the lumbar site.  Plaintiff's electrical injury has not had objective verification other than history and physical examination. Plaintiff was unable to tolerate electrodiagnostic testing.  Plaintiff had a triple-phase bone scan to assess for a painful condition called complex regional pain syndrome (reflex sympathetic dystrophy).  The test was negative.    More recently, the Plaintiff has had electrodiagnostic evidence of carpal tunnel syndrome in both of his wrists.  He has had decompressive surgery at his wrists.

* Plaintiff's medical conditions have only slightly impacted Plaintiff's ability to perform activities of daily living.

* I would estimate Plaintiff would have difficulty lifting, pushing or pulling greater than 15-20 pounds.  He needs to be in an occupation that would allow changing station, and to avoid prolonged standing or walking.

* Plaintiff has chronic pain primarily affecting the low back and left leg.

* I suspect Plaintiff's chronic pain does have some mild adverse affect on his ability to concentrate, although most recently, the Plaintiff has been employed repairing small engines;

* Plaintiff's sleep has been affected by particularly hypersensitivity to his left foot and toes such that he has constructed a protective box to prevent sheets or covers from touching his left foot and toes;

* I do not feel Plaintiff is limited to part-time work;

     *      If Plaintiff had a simple sedentary level 40-hour-per-week job, I would expect him to miss work from time to time due to his pain, on rare occasions.

     *      It's hard to estimate how many days per month he would miss due to his symptoms because Plaintiff had been working prior to his recent carpal tunnel release surgery and I have not been aware of times that he actually needed to miss work.  I would anticipate less than or equal to once a month.

[R. 578–79.]

On September 29, 2011, Dr. Daniel C. Fitzpatrick ("Dr. Fitzpatrick") of Slocum Orthopedics released Plaintiff to return to work with no restrictions after right carpal tunnel release surgery.  [R. 584, 588.] On October 28, 2011, Dr. Fitzpatrick provided the following information regarding his treatment of Plaintiff in response to questions from Plaintiff's counsel:

     *      Plaintiff's upper extremity diagnoses are multiple trigger fingers and bilateral carpal tunnel syndrome;

     *      Indication for surgery was indicated on nerve conduction studies performed on June 17, 2011, by Dr. Andresen and on clinical examination;

     *      Plaintiff's upper extremity symptoms, especially his trigger fingers, significantly affected his ability to perform basic activities of daily living including work functions.

     *      Plaintiff had objective findings and they are all outlined in his multiple clinic visit notes, but include positive provocative tests for carpal tunnel syndrome as well as clear triggering on flexion/extension events with his fingers.

     *      It is difficult to associate Plaintiff's trigger fingers with his work as he seems to have some sort of underlying inflammatory condition which is causing him to have some symptoms in his fingers.   His carpal tunnel syndrome is probably related to his work provided that he is performing forceful gripping activities, which it sounds like by your description of what he performs at work;

    \*       Following his surgeries, Plaintiff had restrictions of no repetitive gripping, no forceful gripping and no lifting more than 10 pounds for six weeks.

    \*       It is difficult to say whether Plaintiff could expect some residual hand impairment lasting more than 12 months given his inflammatory response in his hand.  However, I would not expect somebody with a standard trigger finger or standard carpal tunnel release to be unemployed more than 12 months.  Usually these patients would be able to get back to work within six weeks after surgery.

[R. 581–83.]

### *ALJ's Treatment of Medical Opinions*

After summarizing Dr. Andresen's medical notes, the ALJ concluded that Dr. Andresen's opinion that Plaintiff "would have difficulty with lifting, pushing or pulling greater than 15-20 pounds" and "needs to be in an occupation that would allow changing of his station, and to avoid prolonged standing or walking" was entitled to "some weight because Dr. Andresen is a treating physician, he has examined the claimant on multiple occasions, he supported his opinion with references to objective evidence such as images, and his opinion is consistent with the claimant's ability to engage in a range of activities including work activity." [R. 24.]  The ALJ also noted that Dr. Andresen indicated Plaintiff had been released to essentially a sedentary/light duty capacity job release.  [*Id.*]

The ALJ then indicated that he gave "significant weight" to the opinions of the state agency medical consultants Dr. Eder and Dr. Berner who both found Plaintiff capable of light exertional work. [R. 25.] The ALJ explained that these opinions were "based on a review of the claimant's medical records, the assessment as to the claimant's abilities was supported with references to the objective medical evidence, and the opinions are

consistent with the overall objective evidence of record." [*Id.*] The ALJ concluded that his RFC determination was supported by the evidence of record. [*Id.*]

### Discussion

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court. *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 520. The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir.2005) (*citing* 20 C.F.R. § 404.1527). ALJs typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (*quoting Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 404.1527(c). Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the

30

greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*16 1996 WL 374188, at *4 (July 2, 1996).  However, not every opinion offered by a treating

source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions.  In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner.  Such opinions on these issues must not be disregarded.  However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C .F.R. § 404.1527(e)

(stating an ALJ does not have to "give any special significance to the source of an opinion

on issues reserved to the Commissioner," such as an opinion that the claimant is disabled,

the claimant's impairments meet or equal a listing, or the claimant has a certain RFC).

The Court agrees with Plaintiff that the ALJ incorrectly indicated that his decision

was consistent with Dr. Andresen's opinion when, in fact, the ALJ actually rejected portions

of Dr. Andresen's opinion without sufficient explanation.  Although the ALJ generally

discussed Dr. Andresen's opinion related to standing or walking [R. 24], he did not

sufficiently explain his reasons for refusing to accept the treating physician, Dr. Andresen's,

opinion that "[Plaintiff] needs to be in an occupation that would allow changing station, and

to avoid prolonged standing or walking," as required by SSR 96-2p and SSR 96-8p.  [R.

579.]

Additionally, the Court notes that the record contains evidence regarding Plaintiff's inability to stand and walk which may contradict the RFC determination and which was not expressly weighed or evaluated by the ALJ in his decision. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled). For instance, in a 2008 work capacity evaluation, Mr. Park found Plaintiff to be capable of sitting for a maximum of 60 minutes or two hours during the evaluation. [R. 376.] Plaintiff was also found to be able to stand and move for 15 minutes consecutively and a total of two hours during the evaluation. [*Id.*] Mr. Park also described Plaintiff's walking capacity as equal to 30–45 minutes at a time on level terrain and on an occasional basis. [R. 377.]

The ALJ found Plaintiff retained the RFC to perform light work with certain limitations, i.e., Plaintiff can occasionally stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; and can frequently balance. [R. 22.] The ALJ, however, made no findings as to the amount of time in an 8-hour workday Plaintiff could walk and/or stand, the amount of time he could sit, and whether he would need to alternate positions. The amount of time Plaintiff could stand and walk was critical to the ALJ's RFC determination. Light work, as defined by SSR 83-10, requires a good deal of walking or standing and is the primary difference between sedentary and most light jobs. SSR 83-10, 1983 WL 31251, at *5 (1983). The full range of light work "requires standing and walking, off and on, for a total of approximately 6 hours of an 8–hour workday." *Id.* at *6. Consistent with SSR 83-10, a claimant who is capable of sitting 6 hours a workday and standing or walking 2 hours per workday is limited to sedentary work. *Id.* at *5; *see also O'Shields v. Colvin*, C/A No. 0:12-2327-RMG, 2014 WL 468924, at *5 (D.S.C. Feb. 4, 2014). Thus, by finding

Plaintiff could perform light work without a restriction as to walking, standing, or sitting, the ALJ implicitly found Plaintiff could stand and walk, off and on, for a total of approximately 6 hours of an 8–hour workday.

In assessing RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements. SSR 96-8p, 61 Fed. Reg. 34,474–01, at 34,477 (July 2, 1996). SSR 96-8p specifically states, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* at 34,478. The ALJ, at a minimum, had a duty to explain his evaluation of the above evidence, and he should have sufficiently explained his reasoning for implicitly finding Plaintiff capable of walking and sitting 6 hours in an 8-hour day, in spite of the opinions to the contrary in the medical record. Because the ALJ failed to sufficiently explain his evaluation of the above evidence and did not sufficiently evaluate Plaintiff's RFC, the Court cannot determine that the ALJ's rejection of any limitation on standing and walking, as expressed by Dr. Andresen and Mr. Park, is supported by substantial evidence. *See Radford*, 734 F.3d at 296 (given the medical record, the ALJ's failure to adequately explain his reasoning precluded the district court from undertaking a meaningful review).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner for further administrative action consistent with this recommendation.

IT IS SO RECOMMENDED.

33

January 28    , 2015                           s/Jacquelyn D. Austin
Greenville, South Carolina                    United States Magistrate Judge